318 F.2d 67
 The EMPLOYERS' LIABILITY ASSURANCE CORP., Ltd., Appellant,
v.
Mrs. Alberta Wilkerson BUTLER, individually and as survivor of her minor child Brenda Louise Butler and Columbia Casualty Company, Appellees.
 No. 19599.
 United States Court of Appeals Fifth Circuit.
 May 17, 1963.
 Rehearing Denied July 15, 1963.
 
 Robert E. Leake, Jr., New Orleans, La., for appellant.
 John P. Dowling, New Orleans, La., for appellees.
 Before HUTCHESON, WISDOM, and GEWIN, Circuit Judges.
 WISDOM, Circuit Judge.
 
 
 1
 The plaintiff's decedent, Brenda Butler, a Negro girl not quite sixteen years old, was burned to death as a result of performing a "fire dance" as part of a talent show at the YWCA by the Larry & Frank Teen-Age Fan Club of New Orleans. "Larry" and "Frank" are two fictitious characters in a disc jockey show Alvin R. McKinley regularly conducted on Radio WYLD in New Orleans.
 
 
 2
 Mrs. Butler, under the Louisiana Direct Action Statute, sued Columbia Casualty Company, the YWCA's insurer and The Employers Liability Assurance Corporation, Ltd., WYLD's insurer. At the close of the plaintiff's case, the district court sustained Columbia's motion for a directed verdict and denied Employers' similar motion. The court ruled that there was no basis for application of the last clear chance doctrine. At the close of all the evidence Employers again moved for a directed verdict. It was again denied. The trial court, however, reversed its prior ruling and submitted to the jury the issue of last clear chance. The case went to the jury on special interrogatories. The jury returned twice for further instructions, first on negligence and next on last clear chance.[1] An hour and a half after its final retirement, the jury brought in a verdict for the plaintiff for $10,000. The jury found that both McKinley and Brenda were negligent, but that only McKinley's negligence was proximate to the accident. It found that McKinley's activities in connection with his fan club were part of his duties with WYLD.
 
 
 3
 Employers filed motions for a new trial, directed verdict, and judgment N.O.V. It appeals from the denials of these motions.
 
 
 4
 We reverse on the ground that as a matter of law there was no basis for submitting to the jury the issue of last clear chance.
 
 I.
 
 5
 The facts are relatively undisputed. WYLD, a daytime New Orleans radio station catering to Negro listeners, employed Alvin R. (Larry) McKinley as disc jockey and program director. As program director, his duties consisted of programming, riding herd on the on-the-air personnel, visiting advertisers, and staging various promotional activities, such as dances, to increase the station's audience rating. As disc jockey, he put on "The Larry and Frank Show," for two to four hours during the afternoon, closing at sundown, the station's sign-off time. This program consisted primarily of popular records, commercial advertisements, good-will "service" announcements, and patter, in which McKinley, using two voices, took the parts of both Larry and Frank.
 
 
 6
 In June 1958 a group of teen-age girls decided to form the Larry and Frank Fan Club. McKinley was pleased at the idea and, at the invitation of the girls, attended the organizational meeting. From then on he acted as supervisor or sponsor of the group. It grew very rapidly. McKinley arranged for meetings to be held at the YWCA, and sometimes informal meetings at the WYLD studio, where McKinley would occasionally allow a club member to speak over the air about the club's activities. He had membership cards printed with his picture in the upper right hand corner of the card. Across the top of the card were the words, "I'm a WYLD One." Directly beneath this there was printed "Larry & Frank Fan Club," followed by "WYLD `600' First On Your Radio." The member's name and address and McKinley's signature were also on the card. In July McKinley chartered a Greyhound bus and took the entire membership of the club, by then grown to sixty members, on a picnic, swimming, and baseball outing at Slidell, Louisiana. The group left from the radio station, and, on the advice of the radio station's attorney, McKinley had the parent of each child attending the picnic sign a statement releasing McKinley and Station WYLD from liability for any injury which might occur on the trip. WYLD and McKinley each paid half of the expenses of the trip.
 
 
 7
 Later in the summer, the fan club decided to have a record hop and talent show in order to raise money to buy jackets. The planning of the show was entirely the work of the girls; McKinley was neither present nor consulted. He was, however, asked to act as master of ceremonies.
 
 
 8
 One of the girls who had volunteered to perform in the talent show was plaintiff's fifteen-year-old daughter, Brenda Butler. A week or so before the show she asked McKinley for advice about a "voodoo" or "fire" dance such as she had seen on television. He told Brenda that a female impersonator at a night club in the city did such a dance, that it was perfectly safe, and that he would see if the dancer would help her. McKinley arranged for the dancer to meet with Brenda at the YWCA, and to demonstrate some dance steps. The dancer showed her how to used lighted torches and how to handle the alcohol. He assured her that he had been doing a fire dance for many years and that it was safe. At Brenda's request he agreed to make a costume for her, which she later picked up at WYLD studio the day of the show.
 
 
 9
 The show was held on August 23, 1958, at the YWCA. Although the tickets were captioned "WYLD's Record Hop and Talent Show," witnesses agreed that this was a mistake on the part of the printer and that the tickets were intended to read "WILD Record Hop and Talent Show." The station itself had nothing to do with printing the tickets. McKinley had, however, arranged for the use of the YWCA facilities that night and had given much publicity to the affair over his program.
 
 
 10
 The performance was attended by several hundred young people and a few adults, most of whom were parents of the club members. W. Arthur Selley, Jr., vice president and general manager of WYLD, was also present. McKinley announced each act from in front of the curtain, played the records for each performance, and gave each performer his cue.
 
 
 11
 Brenda's act was last. Just before the program she changed her mind about her costume. Instead of wearing the costume which the dancer had designed she switched to a grass hula skirt. She appeared in this new costume ten or fifteen minutes before she was to go on. While the curtain was drawn, she poured alcohol on the stage — using, according to the testimony, much more than she had at rehearsals. McKinley announced her act and stepped back to start the record. The curtain opened, Brenda set fire to the alcohol, waited for the drum beat on the record which was to give her the cue, and then danced into the flame. The grass skirt caught fire almost immediately and flared up. Brenda panicked. She began running about the stage until McKinley caught her and wrapped her in the stage curtains. She was taken to the hospital immediately and died several days later of the burns suffered.
 
 II.
 
 12
 Appellant maintains that there was insufficient evidence to support a finding that McKinley was acting within the course and scope of his employment when he participated in the activities of the fan club.
 
 
 13
 Article 2320 of the LSA-Civil Code states that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." As the Louisiana Supreme Court has explained in Oliphant v. Town of Lake Providence, 1939, 193 La. 675, 192 So. 95, 101,
 
 
 14
 "The controlling phrase in this article is `in the exercise of the functions in which they are employed'. That means that employers are answerable for damages caused by their employees in the cases only where the damage is done while the employee is performing some duty which he is employed to perform."
 
 
 15
 Here, according to appellant, the undisputed testimony of both McKinley and his superior, W. Arthur Selley, Jr., was that McKinley's activities with the fan club were a personal matter for which he was given no credit, compensation, time off or any other recognition by the radio station. Moreover, all of the club members and participants in the talent show who were called upon to testify stated that neither McKinley nor WYLD had anything to do with the original idea of organizing the fan club and that WYLD was connected in no way with the talent show.
 
 
 16
 Contrary to the appellant's argument, this factual situation is not analogous to the situation in Johnson v. Esso Standard Oil Co., 5 Cir., 1954, 211 F.2d 397. In that case this Court upheld a judgment NOV where the only evidence to connect the defendant oil company with the accident was the fact that its alleged agent, who was going on a hunting trip, was driving a truck with "ESSO" emblazoned upon it at the time of the collision. Here there was much more than the mere use of the radio station's call letters on the talent show tickets to connect WYLD with the accident. McKinley himself testified that part of his duties as program director was to do "whatever is necessary to, as we say in the trade, `tighten up the program,' or increase audience rating," and Selley, vice president and general manager of the station, stated that one of the duties of the program director was to undertake promotional activities on behalf of WYLD. These included things such as dances, "a WYLD Day at Lincoln Beach" with free rides for the children, and a singing contest.
 
 
 17
 WYLD unquestionably derived publicity from the use of its call letters on the fan club's membership cards and on the talent show tickets. It should be noted that although the vice president and general manager of the radio station was present at the performance and was on the stage, he made no effort to disavow the sponsorship which was attributed to WYLD on the tickets. Moreover, the radio station actively encouraged the club by freely broadcasting news of its activities on the air. The rapidity of the club's growth, from the half dozen girls who conceived of the idea, to the thirty or forty who attended the first meeting, the sixty who went on the picnic a month later and the several hundred who went to the talent show, gives some index of the value of the fan club to the radio station as a promotional device. The most telling evidence supporting the jury's finding, however, is the radio station's participation in the fan club's picnic and outing at Slidell. WYLD admittedly bore half the expenses of the trip and was careful to get a statement from each child's parent releasing both it and McKinley from any possible liability. Moreover, the fan club met at the radio station, where the bus was to pick them up.
 
 
 18
 Considering all of this evidence, a jury could properly conclude that sponsoring a teen-age fan club was a promotional gimmick within the scope of the implied functions which McKinley was employed to perform as program director.
 
 III.
 
 19
 The trial judge instructed the jury on last clear chance as follows:
 
 
 20
 "For the successful invocation of the doctrine of last clear chance the exercise or presence of three essential elements must be established: First, that the plaintiff was in a position of peril of which she was unaware, or from which she was unable to extricate herself; that the defendant actually discovered, that is, the defendant's employee in this case, actually discovered or was in a position where he should have discovered the plaintiff's peril; and that, at the time, the defendant's employee could have, with the exercise of reasonable care, avoided the accident. When the doctrine of last clear chance is applicable, the fact that the person in peril may be negligent until the very moment of the accident, the contributory negligence of such person is no bar to recovery."
 
 
 21
 No complaint is made concerning the form of the charge, which is in keeping with the Louisiana decisions. See Bergeron v. Dept. of Highways, 1952, 221 La. 595, 60 So.2d 4; Jackson v. Cook, 1938, 189 La. 860, 181 So. 195; Rottman v. Beverly, 1936, 183 La. 947, 165 So. 153; Maryland Casualty Co. v. Allstate Insurance Co., La.App.1957, 96 So.2d 340. The question before this Court is whether the case presents a last-clear-chance situation at all. Appellant argues that it was Brenda, not McKinley, who had the last opportunity to avoid the accident since it was her act of stepping into the fire which caused the tragedy. Thus, although McKinley's failure to stop a teen-age girl wearing a grass skirt from doing a fire dance might be negligence, this was not the final negligent act or omission which resulted in the tragedy.
 
 
 22
 The point is well taken. The series of negligent acts in this case resemble closely the situation in Brown v. Louisville & Nashville R. R., D.C.E.D.La., 1955, 135 F.Supp. 28, aff'd, 5 Cir., 1956, 234 F.2d 204. In that case a train fireman observed a truck approaching an intersection very slowly but did not tell the engineer, whose view of that side of the track was obscured by the boiler of the locomotive, because he assumed the truck would stop. About fifteen feet from the track the truck accelerated sharply. The fireman shouted a warning to the engineer, who immediately pulled the emergency brake, but the train struck the truck, killing the driver. The trial judge refused to apply the doctrine of last clear chance.
 
 
 23
 "In the case at bar, the defendant actually saw the truck in a position of peril. In fact, the evidence shows that earlier discovery of that peril was precluded by the defendant's negligence. The evidence further shows that the defendant, even after it discovered the peril, had an opportunity to avoid the accident by stopping the train and did not avail itself of the opportunity. The evidence does not show, however, that the plaintiff's decedent was unaware of his own peril or was unable to extricate himself therefrom. The evidence shows that while the defendant was in fact negligent, it was the truck driver who had the last opportunity, the last clear chance, to avoid this accident. The truck, proceeding slowly as it was, could have been stopped in a matter of a very few feet, whereas the train, proceeding at approximately 30 miles per hour, required 526 feet in which to stop." 135 F.Supp. at 31.
 
 
 24
 The present case presents a similar situation. The last act of negligence here was not McKinley's failure to stop the dance because he did not realize Brenda's peril; rather, it was Brenda's act of stepping into the fire. She, and not McKinley, had the last chance to prevent the tragedy. See Maryland Casualty Co. v. Allstate Insurance Co., La.App., 1957, 96 So.2d 340; cf. Jupiter v. United States, D.C. E.D.La., 1960, 181 F.Supp. 294, aff'd, 5 Cir., 1961, 287 F.2d 388.
 
 
 25
 Appellee denies that Brown v. Louisville & Nashville R.R. is in point. She argues that Brenda, unlike the truck driver, was not aware of her danger or the need to extricate herself from a perilous situation. Brenda had been assured both by McKinley and by the dancer that the fire dance was perfectly safe. The latter had told her that he used burning alcohol on both his arms and legs in his dance without getting burned, and had even demonstrated the low heat at which alcohol burns by rubbing some on Brenda's arm and lighting it. He had also ignited alcohol placed in a garbage can cover and passed his hand over it. Brenda's last minute decision to wear a grass hula skirt instead of the costume designed by the dancer, although it might in itself have been gross negligence, indicates her belief that burning alcohol produces too low a heat to ignite anything. Thus, lulled into security by the assurances of McKinley, a man for whom she and the other teen-age girls in the fan club obviously had the greatest respect, and by a professional dancer who had been doing the dance for several years, Brenda was unaware of the great danger to which she was exposing herself. In such a situation, according to appellee, recovery by the plaintiff is permitted under Louisiana law even though the plaintiff has negligently placed herself in a position of peril. See Rottman v. Beverly, 1936, 183 La. 947, 165 So. 153.
 
 
 26
 The appellee, however, has failed to comply with the second requirement for recovery: Not only must the injured party be unaware, albeit negligently, of his peril, the defendant must know of the peril and do nothing to prevent injuring the plaintiff. Where "the evidence does not show that defendant actually discovered or should have discovered plaintiff's peril in time to avoid the accident," there is no liability. Thomas v. Lumbermen's Mutual Casualty Co., La.App., 1962, 146 So.2d 275, 278. The Louisiana Supreme Court has stated the rule even more strongly in Rottman v. Beverly, 1936, 183 La. 947, 165 So. 153, 156.
 
 
 27
 "Where the danger is brought about by plaintiff's own negligence, but is not discovered by defendant, because of a failure to exercise due care, the parties are on equal footing. Their faults are mutual, their negligence is concurrent. It arises from the same cause, viz., failure to observe. The negligence of each party is a contributing cause of the accident. In such case it cannot be determined whether the negligence of the plaintiff or that of the defendant was the proximate and immediate cause of the injury, and neither party can recover."
 
 
 28
 Prosser gives a similar explanation for the reason for requiring that the defendant know of plaintiff's peril rather than merely being negligent in failing to discover it.
 
 
 29
 "If the defendant does not discover the plaintiff's situation, but merely might do so by proper vigilance, it is obvious that neither party can be said to have a `last clear' chance. The plaintiff is still in a position to escape, and his lack of attention continues up to the point of the accident, without the interval of superior opportunity of the defendant which has been considered so important. The plaintiff may not demand greater care for his own protection than he exercises himself." Prosser, The Law of Torts § 52, p. 294 (2d ed. 1955).
 
 
 30
 In the present case there is nothing in the evidence to show that McKinley was any more aware than Brenda of the danger. He had seen a "fire dance" done in a nightclub and had assumed that it could be done safely. He had not seen her practice the dance at rehearsals and did not know that she planned to step into the fire rather than dance behind it. Moreover, at the time of the performance the lights were dim, and McKinley did not particularly notice Brenda. As he testified: "I noticed she had a costume on, and I didn't actually watch her because I had my own duties on the stage. On the stage I had a cue sheet, and I was supposed to put a record on, and she was supposed to go into the dance routine. I noticed that she was on the stage, and I guess I noticed the costume, but as far as actually, just — I noticed that it was a costume, and that's all. But I didn't pay any attention." Although McKinley might have been negligent in not observing more closely Brenda's costume and her preparations for the dance, the plaintiff cannot demand of the defendant a higher standard of care in noticing and evaluating the surrounding circumstances than the injured party herself exercised.
 
 
 31
 It may well be true that the doctrine of the last clear chance is "a transitional one, a way station on the way to apportionment of damages," Brown v. Louisville & Nashville R. R., D.C.E.D.La., 1955, 135 F.Supp. 28, 31, aff'd, 5 Cir., 1956, 234 F.2d 204. Many commentators have pointed out that it evolved as a method of escape from the ruling that contributory negligence is a complete bar to recovery, and has introduced some notion of comparative negligence into the common law of torts. See, e. g., MacIntyre, The Rationale of Last Clear Chance, 53 Harv.L.Rev. 1225 (1940); James, Last Clear Chance: A Transitional Doctrine, 47 Yale L.J. 704 (1938); Stone, Tort Doctrine in Louisiana: The Concept of Fault, 27 Tul.L.Rev. 1, 17 (1952). The particular facts of this case and the relatively small verdict awarded seem to indicate that the jury below did indeed use some notion of comparative negligence of the parties in reaching their decision. Although it might be argued that this is precisely what the doctrine was intended to accomplish, the limitations of the doctrine must nonetheless be recognized. It should not be applied indiscriminately to situations which would make even more unrealistic an already highly artificial method of determining ultimate liability for negligence. The Louisiana courts would not allow the use of the last clear chance doctrine to impose liability in this situation, see, e. g., Thomas v. Lumbermen's Mutual Casualty Co., La.App., 1962, 146 So.2d 275. Neither can we.
 
 
 32
 The judgment below is reversed with directions that judgment be entered for the defendant.
 
 
 
 Notes:
 
 
 [1]
 The jury retired at 2:10 p. m. It returned at 4:45 p. m. for additional instructions on the interrogatories dealing with negligence. It retired again at 4:52 p. m. and again returned at 5:35 p. m., and this time the jury wanted further instructions on the question of last clear chance. At 7:05 p. m. the jury returned with a verdict